IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| JOE JESSE MONGE and ROSANA ELENA MONGE, Plaintiffs, | § § § § § | |
| v. | § § | EP-14-CV-385-PRM |
| ALICIA ROJAS, FRANCISCO JAVIER JAYME, MONROJ INVESTMENTS, INC., NORTHEAST PATRIOT PLAZA, INC., Defendants. | § § § § § § § | |

## ORDER ADOPTING IN PART PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

On this day, the Court considered the U.S. Bankruptcy Court for

the Western District of Texas, El Paso Division's ("Bankruptcy Court")

"Proposed Findings of Fact and Conclusions of Law with Respect to

Trial in Adversary Proceeding No. 10-03019" [hereinafter "Proposed

Findings and Conclusions"] (ECF No. 1-2), filed on September 5, 2014;[1]

and Plaintiffs Joe Jesse Monge and Rosana Elena Monge's "Objections

to Proposed Findings of Fact and Conclusions of Law with Respect to

---

[1] This date is the date that the Proposed Findings and Conclusions were filed on the Bankruptcy Court's docket. The Proposed Findings and Conclusions were filed with the Court on October 17, 2014.

1

Trial in Adversary Proceeding No. 10-03019" (Bankruptcy Court Docket No. 370) [hereinafter "Objections"], filed on September 19, 2014,[2] in the above-captioned cause (Bankruptcy Court case number 09-30881-HCM). After due consideration, the Court is of the opinion that the Bankruptcy Court's Proposed Findings and Conclusions should be adopted in part for the reasons that follow.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The instant case arose from a series of real estate transactions involving Plaintiffs and Defendants Francisco Javier Jayme and Alicia Rojas ("Defendants")[3] that took place in 2006.  Proposed Findings & Conclusions 18–20.  The dispute between the parties involves four different properties:  (1) the Thoroughbred Property, a residential home in Santa Teresa, New Mexico; (2) the Country Cove Subdivision, several plots of undeveloped land located in Dona Ana County, New Mexico; (3) the Transmountain Property, undeveloped land in El Paso, Texas; and

---

[2] Due to the voluminous documents associated with this case, the record, including the Objections, were not filed on the electronic case file system, so they will be identified by their Bankruptcy Court Docket Number.  Accordingly, the date provided is the date that Plaintiffs' Objections were filed in the Bankruptcy Court.
[3] Although there are other Defendants in this case, all other Defendants have either settled or defaulted.  Thus, for the sake of simplicity, the Court will refer to Defendants Jayme and Rojas as "Defendants."

(4) the Sierra Crest Property, a residential home in El Paso, Texas. *Id.* 20–24.

In 2006, Plaintiffs and Defendants formed Defendant Monroj Investments, Inc. ("Monroj") in order to acquire the Country Cove Subdivision. *Id.* 21. Also in 2006, Plaintiffs and Defendants formed Defendant Northeast Patriot Plaza, Inc. ("Northeast Patriot") in order to acquire the Transmountain Property, on which they planned to build a medical clinic. *Id.* 22–23, 60. In order to finance the purchase and development of the Country Cove Subdivision, Plaintiffs agreed to purchase Defendants' home (the Thoroughbred Property) in Santa Teresa, New Mexico. *Id.* 29. By selling their home, Defendants hoped to receive $300,000 in equity, which could then be used for the Country Cove Subdivision. *Id.* 29. Plaintiffs obtained a mortgage loan for $697,500 in order to purchase the Thoroughbred Property. *Id.* 28. The sale closed on February 3, 2006. *Id.* On that same day, Defendant Rojas and Plaintiff Joe Monge entered into a residential lease agreement with an option to purchase for the Thoroughbred Property. *Id.* 33. In this agreement, Defendant Rojas agreed to pay rent "equal to the amount of the Monges' payments to America's Wholesale Lender on

3

the Thoroughbred Mortgage." *Id.* 34; P-32, at 57–65. Attached to the lease was an option agreement, which gave Defendant Rojas the opportunity to purchase the Thoroughbred Property. Proposed Findings & Conclusions 35.

Three months after purchasing the Thoroughbred Property, Plaintiffs purchased the Sierra Crest Property, with Defendants Jayme and Rojas acting as a real estate broker and mortgage broker, respectively. *Id.* 23. At some point after purchasing the Sierra Crest Property, the business and personal relationships between Plaintiffs and Defendants began to sour.

The problems started with the sale of the Thoroughbred Property. Defendants did not receive any cash from the sale of their home to Plaintiffs. *Id.* 32; *see also* Ex. P-4, at 45–46. Without that money, the real estate projects that Plaintiffs and Defendants had planned were doomed to fail. Defendants were also unable consistently to make rental payments to Plaintiffs. Proposed Findings & Conclusions 37–38. Prior to selling, Defendants had been unable to make their $3,000 monthly mortgage payments and were in foreclosure. *Id.* 24–25. Unsurprisingly, they were similarly unable to pay rent for the same

4

home in the amount of almost $5,600 per month.  Plaintiffs attempted to evict Defendants, but were unable to do so due to a dispute about whether the land was located in Texas or New Mexico.[4]  *Id.* 44–45. Plaintiffs eventually fell behind on their mortgage payments and went into foreclosure.[5]  *Id.* 45–47.

On April 27, 2009, Plaintiffs filed a voluntary Chapter 11 bankruptcy petition in the Bankruptcy Court.  Proposed Findings & Conclusions 7.  Then, on June 14, 2010, Plaintiffs filed their Original Complaint against Defendants in the Bankruptcy Court.  *Id.*  Plaintiffs filed a Second Amended Complaint on July 2, 2012, which expanded the scope of the litigation and the number of defendants.[6]  *Id.* 8. Defendants also filed several counterclaims against Plaintiffs.  Their Fourth Amended Counterclaim was filed on September 19, 2013.  *Id.* 9.

---

[4] The Bankruptcy Court determined that the Thoroughbred Property is located in New Mexico.  Proposed Findings & Conclusions 49.  Neither party objected to this finding.

[5] The problems did not end there.  Plaintiffs also experienced several problems with the Sierra Crest Property, which they purchased with assistance from Defendants. *Id.* 73.  Specifically, the house had significant structural issues and black mold, which according to Plaintiffs, rendered the home uninhabitable.  *Id.*  In addition, numerous problems arose in relation to the other properties as well.  However, these problems are not at issue here because Plaintiffs' objections mainly concern the Thoroughbred Property.

[6] The Second Amended Complaint added defendants Monroj Investments, Inc., Northeast Patriot Plaza, Inc., Joe Villa, Allison Villa, and Hugo Maynez Maldonado, all of whom have either settled or defaulted.  Second Am. Compl., Bankr. Ct. Dock. No. 58.

The Bankruptcy Court presided over a bench trial[7] on July 17–18, 2014 and August 4–8, 2014. *Id.* 12.  Plaintiffs filed a "Statement Regarding Consent" wherein they "consent[ed] to the entry of final orders and/or judgment by the Bankruptcy Court Judge."  Pls.' Statement Regarding Consent 4, May 9, 2013, Bankr. Ct. Dock. No. 159.  Defendants also filed a statement wherein they consented to the entry of final orders and judgment by the Bankruptcy Court Judge. Am. Statement Regarding Consent 2, June 20, 2013, Bankr. Ct. Dock. No. 176.  Despite the consent of the parties, the Bankruptcy Court did not enter final judgment upon conclusion of the trial.

Rather, pursuant to the Fifth Circuit's recent decision in *BP RE L.P. v. RML Waxahachie Dodge L.L.C.*, 735 F.3d 279 (5th Cir. 2013), the Bankruptcy Court submitted its Proposed Findings and Conclusions to the Court for entry of final judgment.  In the Proposed Findings and Conclusions, the Bankruptcy Court found Defendants liable to Plaintiffs for actual damages of $712,178 and attorneys' fees and expenses of $240,238.  Proposed Findings & Conclusions 89, 95.  Plaintiffs filed

---

[7] Neither party requested a jury trial.

objections to the Proposed Findings and Conclusions on September 19, 2014.  Bankr. Ct. Dock. No. 370.  Defendants did not file objections.

## II.   STANDARD OF REVIEW

Pursuant to the Bankruptcy Code, enacted in 1984, district courts may refer "cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11" to a bankruptcy court.  28 U.S.C. § 157(a).  Section 157 provides that bankruptcy courts "may enter appropriate orders and judgments" in core proceedings.   For non-core proceedings, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge . . . after reviewing de novo those matters to which any party has timely and specifically objected."  *Id.* § 157(c)(1).  The bankruptcy court may, however, issue a final judgment in non-core proceedings when all the parties have so consented.  *Id.* § 157(c)(2).

The instant case involves both core and non-core proceedings. Proposed Findings & Conclusions 3.  Both parties consented to the Bankruptcy Court's entry of final judgment on non-core proceedings. Pls.' Statement Regarding Consent 4, May 9, 2013, Bankr. Ct. Dock. No.

7

159; Am. Statement Regarding Consent 2, June 20, 2013, Bankr. Ct. Dock. No. 176. Therefore, the Bankruptcy Court had the statutory authority to enter final judgment in this case. However, the Fifth Circuit recently held that bankruptcy courts lack constitutional authority to enter a final judgment on state law claims that do not stem from the bankruptcy itself, even where parties have consented. *BP RE L.P.*, 735 F.3d at 291. Instead, bankruptcy courts must issue proposed findings of fact and conclusions of law to the district court. *Id.* Accordingly, the Bankruptcy Court issued its Proposed Findings and Conclusions so that the Court could enter final judgment. Because Plaintiffs filed objections, the Court will review de novo the portions of the Proposed Findings and Conclusions to which the parties properly and specifically objected.

## III. ANALYSIS

Plaintiffs object to eleven of the Bankruptcy Court's Proposed Findings and Conclusions. In objections one and two, Plaintiffs object to two of the Bankruptcy Court's factual findings. Obj. 4, 8. In objection three, Plaintiffs object to the Bankruptcy Court's calculation of damages. Obj. 13. In objections four and five, Plaintiffs object to the

8

Bankruptcy Court's denial of punitive damages. Obj. 16, 20. Finally, objections six through eleven all concern the Bankruptcy Court's denial of claims brought pursuant to Texas state law, rather than New Mexico state law. Obj. 27–42. The Court will consider each objection in turn.

## A.   Objections to Factual Findings

### 1.   Objection One

Plaintiffs first object to the Bankruptcy Court's finding that Plaintiffs were aware that Defendants did not obtain $300,000 in equity from the sale of the Thoroughbred Property. Obj. 4–8. As previously noted, Defendants sold their home (the Thoroughbred Property) to Plaintiffs in order to realize the equity in the home and to use that equity to finance their real estate endeavors, but Defendants did not actually receive any cash from the sale. Proposed Findings & Conclusions 32.

Plaintiffs assert that Defendants never told them that they did not receive any cash from the sale of the home. Obj. 7–8. However, the exhibits contradict this assertion. The HUD-1 Settlement Statement ("HUD document") showed that the seller, Defendant Jayme, received zero dollars at closing. Ex. P-4, at 45–46. The HUD document bears

9

Plaintiffs' signatures and is dated February 3, 2006.  Ex. P-4, at 47.  At

trial, Plaintiff Rosana Monge stated that she did not receive a copy of

the HUD document at closing.  TR-08-04-2014, P-84, L-2-10.  She

further stated that she did not believe that the signature at the bottom

of the page belonged to her.[8]  TR-08-05-2014, P-59, L-12-13.

Significantly, Plaintiffs did not offer any expert testimony

supporting their assertion that their signatures had been forged.

Proposed Findings & Conclusions 69.  Thus, the only evidence that their

signatures were forged is Plaintiff Rosana Monge's self-serving

statement that she did not sign the HUD document.  Given that

Plaintiff's testimony comes eight years and six months after the

document was signed, the Court does not credit her testimony regarding

the signature on the document.[9]  Thus, the Court overrules Plaintiffs'

objection and finds that Plaintiffs did sign the HUD document and

---

[8] The Court understands Plaintiffs to be contesting both signatures, although it is somewhat unclear.

[9] Moreover, the Court notes that the Bankruptcy Court Judge was in the best position to make determinations regarding Plaintiffs' credibility having presided over the trial and having witnessed their demeanor.  The Bankruptcy Court found that Plaintiff Rosana Monge's testimony regarding her signature on various documents was "inconsistent and not entirely believable."  Proposed Findings & Conclusions 14.

should have been aware that Defendants received no cash from the sale of the Thoroughbred Property.

## 2.   Objection Two

Second, Plaintiffs object to the Bankruptcy Court's finding that it could not determine whether Plaintiffs signed certain loan documents. Obj. 8–13. As already noted, Plaintiffs purchased the Sierra Crest Property in 2006. Proposed Findings & Conclusions 23. In order to qualify for financing to purchase the Sierra Crest Property, Defendant Rojas helped Plaintiffs complete a loan application. *Id.* 67. The application that Defendant Rojas completed falsely represented that Plaintiffs received $7,500 per month in rental income from two properties. *Id.* Attached to the application were two leases—one for the Thoroughbred Property and one for a property located on Fillmore Road in El Paso, Texas ("Fillmore Property"). *Id.*

The lease for the Thoroughbred Property indicated that Plaintiffs had leased it to Dr. Luis and Alejandra Maroni from August 2006 to July 2009. *Id.* 68. The lease for the Fillmore Property indicated that Plaintiffs had leased it to Mr. Joe Villa from February 2006 to February 2011. *Id.* The Bankruptcy Court found that the leases were "fictitious."

11

*Id.* 69.  At trial, all the parties to the purported leases denied ever having entered into these lease agreements.  *Id.* 68.  The Bankruptcy Court found that Dr. Maroni, Alejandra Hernandez (Maroni), and Joe Villa's signatures had been forged based on their credible testimony. *Id.*  However, the Bankruptcy Court was unable to determine whether Plaintiffs signed the leases.  *Id.* 69–70.

Plaintiffs assert that their signatures were forged.  Obj. 13. According to Plaintiff Rosana Monge's testimony, she would occasionally visit Defendant Rojas's office "after hours."  Tr-08-05-2014, P-7, L-2-7.  Araceli Herrera, an employee of Defendant Rojas, also testified that Plaintiffs would sometimes come into the office after 5:00 pm.  Tr-08-05-2014, P-10, L-9-19.  The leases, however, were faxed from Defendant Rojas's office at 10:46 am on January 10, 2006 and 4:05 pm and 4:35 pm on January 27, 2006.  From these facts, Plaintiffs conclude that their signatures *must* have been forged because "[a]ll four fraudulent leases were faxed from Defendants' office [] prior to 5 pm[,]" and "Plaintiffs could not have delivered the fraudulent leases to Defendants' office [prior to 5 pm]."  Obj. 13.

The Court finds Plaintiffs' reasoning unpersuasive. First, it does not necessarily follow that the leases were signed the same day that they were faxed. The Thoroughbred lease was purportedly signed on July 10, 2006, but it was not faxed until July 25, 2006. Ex. P-11, at 674; TR-08-05-2014, P-17, L-14-21. Plaintiffs could have signed the lease after 5:00 pm on any day between July 10 and July 25, 2006. The same is true of the Fillmore lease. Thus, the only evidence that Plaintiffs' signatures were forged is the testimony by Plaintiffs. The Court is unconvinced by Plaintiffs' self-serving statements regarding their signatures, and it thus cannot determine whether Plaintiffs signed the leases. Accordingly, Plaintiffs' second objection is overruled.

## B.  Objections to Damages Calculation

Plaintiffs next object to the Bankruptcy Court's calculation of actual damages. Obj. 13. The Bankruptcy Court found that Defendants are liable to Plaintiffs for an intentional violation of the automatic stay imposed by 11 U.S.C. § 362(k) and for breach of contract.[10] Proposed Findings & Conclusions 82, 85–86. The Bankruptcy Court calculated actual damages to total $712,178. *Id.* 82, 89. Plaintiffs object to the

---

[10] The Bankruptcy Court applied New Mexico contract law even though Plaintiffs brought their breach of contract claim pursuant to Texas law.

method of calculation used by the Bankruptcy Court. According to
Plaintiffs, the Bankruptcy Court found that "Defendants, under the
terms of the Lease, were responsible for the monthly rent, equal to the
amount of the monthly mortgage payments on the Thoroughbred
Property." Obj. 14 (citing Proposed Findings & Conclusions 89).
Plaintiffs argue that "the monthly mortgage payments on the
Thoroughbred Property would necessarily have to include any portion of
the monthly payment directed toward the principal, interest, or
escrow." *Id.* Plaintiffs thus assert that the Bankruptcy Court erred in
failing to include in its damages tabulation "any of the unpaid accrued
interest and additional bank charges incurred as a result of Defendants'
failure to timely pay the monthly rents due . . . or the unpaid escrow
amounts [for which] . . . Defendants were responsible under the terms of
the lease." *Id.* Plaintiffs request that the Court award actual damages
in the sum of $1,195,054, which is the amount of principal, interest, and
escrow that *Plaintiffs owe* for *their mortgage* on the Thoroughbred
Property. *Id.* 15.

It is true that the lease agreement requires Defendants to be
responsible for the full monthly mortgage payment, which would have

14

included accrued interest. The lease agreement specifically provides that the monthly payment may change to "reflect changes in the unpaid Principal" and the interest rate.  Ex. P-19, at 175.  Plaintiffs have proffered evidence that the amount due on the mortgage now totals approximately $1.2 million due to interest and escrow charges.  Obj. 14–15 (citing Ex. P-50).  It is also true that had Defendants fulfilled their obligations to pay rent, it is less likely that Plaintiffs would have defaulted on their mortgage and accrued these interest and escrow charges.  However, the Court declines to award Plaintiffs $1.2 million in damages because Plaintiffs have failed to establish what Defendants' monthly payments would have been for all relevant periods.  The Court has no evidence to determine how much the lease payments would have increased each year and how Defendants received notice of these increased payments (and whether they actually were notified).  The damages that the Court calculates are for missed rental payments. Thus, it is insufficient for Plaintiffs simply to provide a statement of the amount due on their home in 2014 for the purpose of establishing how much Defendants owed them in rental payments from 2008–2014.

During the effective term of the lease—February 3, 2006 through January 31, 2007—Defendants were required to pay an amount of rent "equal to the amount of the Plaintiffs' payments to America's Wholesale Lender on the Thoroughbred Mortgage." Ex. P-32, at 58. Plaintiff's copy of the Adjustable Rate Note for the Thoroughbred Property lists the initial monthly payment as $5,328. Ex. P-19, at 175. Therefore, Defendants were responsible for paying Plaintiffs $63,936 in rental payments for the lease period, or $5,328 multiplied by twelve (for the twelve months from February 2006 through January 2007).[11] Defendants paid $12,568 during the period of the lease. Proposed Findings & Conclusions 39. Therefore, they are liable for the difference between $63,936 and $12,568, which amounts to $51,368.

Defendants also continued to occupy the Thoroughbred Property after the lease term ended. Holdover tenants are "obligated to pay the reasonable rental value" to their landlords. *Economy Rentals, Inc. v.*

---

[11] It should be noted that this method of calculation is different from the one used by the Bankruptcy Court. The Bankruptcy Court multiplied the monthly payment by eleven, for March 2006–January 2007 and thus came up with a different amount of damages. Proposed Findings & Conclusions 87. The Bankruptcy Court stated that Defendants' rental payments were to begin in March 2006, Proposed Findings & Conclusions 36, however, the Court is unable to determine how the Bankruptcy Court arrived at that conclusion as nothing in the lease indicates that Defendants did not owe rent for the month of February.

*Garcia*, 819 P.2d 1306, 1319 (N.M. 1991).  "To determine the reasonable rental value, a court can properly use the rental payment in a lease." *Id.* Here, the lease specified that where the "tenant remained in possession and held over past the Lease Term," the "tenant would be charged the amount of rent plus the amount of 50%."  Ex. P-31, at 61. Fifty percent of the monthly rent equals $2,664 dollars a month, which brings the monthly rental payment total to $7,992.[12]  Defendants occupied the Thoroughbred Property as holdover tenants from February 1, 2007 through August 2014.[13]  Thus, Defendants owed Plaintiffs $727,272 in rent for that time period ($7,992 multiplied by ninety-one months).  Defendants made $61,134 in payments to Plaintiffs for rent during this time period.  Findings & Conclusions 89.  Therefore, Plaintiffs are awarded $666,138 in damages ($727,272 less $61,134).

The Bankruptcy Court also determined that Defendants violated the automatic stay imposed by 11 U.S.C. § 362(a)(3) by continuing to

---

[12] The Court notes that when Defendants made rental payments in 2007 and 2008, their payments were for the amount of $7,019.  Proposed Findings & Conclusions 46.

[13] In motions filed on December 16, 2014 and December 24, 2014, Plaintiffs assert that Defendants remain in possession of the Thoroughbred Property.  Defendants did not dispute this fact.  Thus, Defendants also owe Plaintiffs an additional $7,922 for each month past August, 2014 in which they have lived on the Thoroughbred Property, which amounts to an additional $39,610 ($7,922 multiplied by five, for the months of September 2014 through January 2015).

exercise control over the Thoroughbred Property after Plaintiffs had filed their bankruptcy petition.  Proposed Findings & Conclusions 80. Section 362(k)(1) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees . . ." The actual damages that Plaintiff sustained by the violation of the automatic stay were for loss of rental income; however, the Court has already awarded Plaintiffs damages for unpaid rental income.  Therefore, any damages awarded for violation of the automatic stay would be duplicative. *See Bank One, Tex., N.A. v. Taylor*, 970 F.2d 16, 34 (5th Cir. 1992) ("[A] party 'cannot recover the same damages twice, even though the recovery is based on two different theories . . . .'" (citation omitted)); *Hood v. Fulkerson*, 102 N.M. 677, 680 (1985) ("Where there are different theories of recovery and liability is found on each, but the relief requested was the same, namely compensatory damages, the injured party is entitled to only one compensatory damage award.").  The Court thus concludes that Plaintiffs are not entitled to additional damages for the violation of the automatic stay.

The Bankruptcy Court did not determine what amount of prejudgment interest, if any, should be applied to the damages award. Plaintiffs did not request a specific interest rate, stating only that they requested "[p]re-judgment interest [] at the highest legal or contractual rate allowed by law."  Post-trial Br., Bankr. Ct. Dock. No. 354, at 144. Thus, the Court must determine if prejudgment interest should be awarded, and if so, at what rate.

Federal district courts have discretion in determining what rate of prejudgment interest to apply in calculating damages and entering judgment.[14]  *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1029 (5th Cir. 2012).  The Court finds that Plaintiffs are entitled to prejudgment interest in this case, at a rate of 8.430 percent per annum, which is the original rate of interest for Plaintiffs' mortgage on the Thoroughbred Property.   Ex. P-10, at 484.  The Court finds that this interest rate is reasonable and adequately compensates Plaintiffs for

---

[14] The Court notes that 28 U.S.C. § 1961 sets the post judgment interest rate for civil money judgments in federal court.  Some courts also use this rate as the prejudgment interest rate; however, such a result is not required by the statute. *Reeled Tubing, Inc.*, 794 F.3d at 1029; *see also Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F.3d 1280, 1289 (9th Cir. 1984) ("Although § 1961 does not provide for prejudgment interest, it is entirely compatible with awards of such interest.").

the interest charges they incurred as a result of Defendants' breach of contract and violation of the automatic stay.

The Bankruptcy Court proposed that interest should accrue beginning on April 29, 2008. Proposed Form of Final J. 2, ECF No. 1-2. While the Bankruptcy Court did not provide a rationale for selecting this date, it is consistent with the Bankruptcy Court's finding that Defendants made no rental payments to Plaintiffs since April 2008. Proposed Findings & Conclusions 47. The Court finds that this date is appropriate, and thus, prejudgment interest will accrue from April 29, 2008 to the date of this order.[15]

## C.   Objections to Denial of Punitive Damages

Plaintiffs next object to the Bankruptcy Court's failure to award punitive damages. Obj. 16, 20. Pursuant to 11 U.S.C. § 362(k)(1), a court may award punitive damages for intentional violations of the

---

[15] There is little guidance from other courts as to how to determine the date from which interest should accrue. However, cases involving prejudgment interest in the context of admiralty law suggest that interest should begin to accrue on the date of loss (or injury), rather than on the date a claim is filed. *Reeled Tubing, Inc.*, 794 F.2d at 1028. Also in the context of admiralty cases, the Supreme Court explained that prejudgment interest is awarded to ensure full compensation for loss and that "[b]y compensating 'for the loss of use of money due as damages from the time the claim accrues until judgment is entered,' . . . an award of prejudgment interest helps achieve the goal of restoring a party to the condition it enjoyed before the injury occurred." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 196 (1995) (citations omitted) (alterations added). The Court finds that this rationale is applicable in this case.

automatic stay imposed by 11 U.S.C. § 362(a) in "appropriate circumstances." The Fifth Circuit has interpreted "appropriate circumstances" to mean "egregious, intentional misconduct on the violator's part." *In re Repine*, 536 F.3d 512, 521 (5th Cir. 2008) (internal quotation marks and citation omitted). The Fifth Circuit has further determined that continuing to violate the automatic stay after being repeatedly warned about the violation of the stay is an example of egregious misconduct. *Id.; see also In re Bloom*, 875 F.3d 224, 228 (5th Cir. 1989) (upholding an award of punitive damages because the party was repeatedly warned about his violation of the automatic stay).

In this case, we know that Plaintiffs warned Defendants that they were in violation of their lease agreement on several occasions and threatened them with eviction. Proposed Findings & Conclusions 43–44. However, Plaintiffs do not point to any warnings that were sent to Defendants notifying them of their violation of the automatic stay. Accordingly, the Court concludes that Plaintiffs have failed to meet

their burden to establish egregious conduct and their objection to the

Bankruptcy Court's denial of punitive damages is overruled.[16]

Plaintiffs also object to the Bankruptcy Court's denial of punitive

damages pursuant to New Mexico law.  Obj. 20.  In New Mexico, in

order to award punitive damages in a breach of contract action, there

must be "evidence of a culpable mental state . . . or other form of

overreaching, malicious, or wanton conduct." *Constr. Contracting &*

*Mgmt., Inc. v. McConnell*, 815 P.2d 1161, 1165 (1991).  Plaintiffs assert

that Defendants were aware of, and intentionally concealed, the fact

that they could not make their rental payments.  Obj. 23.  However,

there is evidence to show that Defendants thought they might be able to

sell the Country Cove Subdivision plots quickly enough to enable them

to afford their new higher rental payments.  TR-07-17-2014, P-87, L-6-

17.  Thus, Plaintiffs have not met their burden to show that Defendants

had the culpable mental state when they breached the contract that

---

[16] Plaintiffs also cite Defendants' attempt to sell the Thoroughbred Property to
themselves in 2012 as an example of their egregious conduct.  Obj. 19.  Plaintiffs
point to Exhibit P-4, at 233–37 to show that Defendants attempted to obtain a loan
to purchase the home.  The Bankruptcy Court did not make a finding regarding
Defendants' alleged attempt to sell the home, nor can the Court determine that
Defendants attempted to sell the home because the exhibit to which Plaintiffs point
does not clearly establish that fact, and there is no credible testimony regarding
that fact.

might arguably support the award of punitive damages. Accordingly, the Court concludes that Plaintiffs are not entitled to punitive damages pursuant to New Mexico law and overrules Plaintiffs' objection.

## D.   Objections to Application of Texas Law

Objections six through eleven all concern the Bankruptcy Court's denial of claims based on Texas law. Specifically, Plaintiffs brought causes of action for fraud, fraud by non-disclosure, and breach of duty of good faith and fair dealing pursuant to Texas law.[17] However, the Thoroughbred Property, the land at issue in these claims, is located in New Mexico.[18] Proposed Findings & Conclusions 49. The Bankruptcy Court concluded that New Mexico law applies to disputes regarding the Thoroughbred Property[19] and thus dismissed the claims brought

---

[17] Plaintiffs never explicitly state that they are bringing Texas causes of action, but they cited to Texas case law in their Post-Trial Brief. Bankr. Ct. Dock. No. 354, at 98.

[18] Neither party objected to this finding.

[19] The Bankruptcy Court applied the "law of the situs" rule to determine that New Mexico law applies. Proposed Findings & Conclusions 113. Plaintiffs did not object to this conclusion. In fact, Plaintiffs admitted that New Mexico law applies in various filings. *See, e.g.*, Second Am. Compl., Bankr. Ct. Dock. No. 233, at 3; Pls.'s and Counter-Defs.' Post-Trial Br., Bankr. Ct. Dock. No. 354, at 115. Because Plaintiffs have not objected to this finding (and because the results are the same regardless of which law applies), the Court will not disturb it, despite the fact that the Bankruptcy Court perhaps over simplified the choice-of-law analysis.

pursuant to Texas law.[20]  *Id.* 97, 106.  Plaintiffs object to the denial of

these claims and assert that although they cited to Texas case law, they

never "disclaimed a New Mexico claim when the elements for the claim

were the same as, or similar to, the elements presented in the Texas

cases."  Obj. 33.

As already mentioned, the Bankruptcy Court applied New Mexico

contract law to Plaintiffs' breach of contract claim even though

Plaintiffs' Post-Trial Brief (Bankr. Ct. Dock. No. 354) suggested that

Plaintiffs were bringing their claim pursuant to Texas law.  Therefore,

the Court sees no reason why it should treat Plaintiffs' other claims any

differently.  Accordingly, the Court will determine whether Plaintiffs

should prevail on their claims for fraud, fraud by non-disclosure, and

breach of the duty of good faith and fair dealing pursuant to New

Mexico law.

## 1.    Fraud Claim (Objections Six and Seven)

Plaintiffs claim that Defendants committed fraud when

Defendants sold Plaintiffs the Thoroughbred Property without

---

[20] The Court also determined, in the event that Texas law did apply, that Plaintiffs failed to prove that Defendants were liable for fraud, fraud by non-disclosure, or for a breach of the duty of good faith and fair dealing.  Proposed Findings & Conclusions 97, 106.

informing Plaintiffs that Defendants no longer owned the property. Obj. 32.  Pursuant to New Mexico law, a claim for fraud requires a showing of the following elements:  (1) "a misrepresentation of a fact," (2) "known to be untrue by the maker," and (3) "made with an intent to deceive and to induce the other party to act upon it with the other party relying upon it to his injury or detriment."  *Unser v. Unser*, 86 N.M. 648, 653–54 (1974).

It is true that Defendants were in foreclosure when they sold their home and that they did not inform Plaintiffs of this fact.  However, Defendants still had a statutory right of redemption on the Thoroughbred Property.  Proposed Findings & Conclusions 28–29. Therefore, even though the home was in foreclosure when they agreed to sell it, they *did* have a claim to ownership.  Thus, Defendants did not necessarily misrepresent a fact.  Moreover, even if Defendants did make a false statement, there is no indication that their intent was to deceive. On the contrary, it appears from the record that Defendants intended to use the money they received from their other investments with Plaintiffs to pay the rent on the property and eventually buy the house

back from Plaintiffs.  Ex. P-46, at 24–26.  Accordingly, Plaintiffs have
failed to prevail on their fraud claim and their objection is overruled.

**2.    Fraud by Non-disclosure Claim (Objections Eight and
Nine)**

Plaintiffs also claim that the above-listed facts support a claim for
fraud by non-disclosure.  In order to prevail on a fraud by non-
disclosure claim, Plaintiffs must show that Defendants knew of
material facts, had a duty to disclose, and remained silent.  *Krupiak v.
Payton*, 90 N.M. 252, 253 (1977).  Plaintiffs claim that Defendants are
liable for fraud by non-disclosure because they did not disclose to
Plaintiffs the fact that they no longer held title to the Thoroughbred
Property.  Obj. 36.  Plaintiffs further claim that pursuant to New
Mexico law, Defendants owed them a duty to disclose.

In general, "in the conduct of various transactions between
persons involving . . . property . . . there are times and occasions when
the law imposes upon a party a duty to speak."  *Everett v. Gilliland*, 141
P.2d 326, 330 (N.M. 1943).  The rule applies when "one party to a
contract or transaction has superior knowledge, or knowledge which is
not within the fair and reasonable reach of the other party and which

he could not discover by the exercise of reasonable diligence . . ." *Id.* .
As Plaintiffs themselves noted,[21] the fact that the home was in
foreclosure could have been discovered through a title search.
Moreover, Bankruptcy records are public records, and thus, Plaintiffs
could have discovered that Defendants had initiated bankruptcy
proceedings through the exercise of reasonable diligence.  The Court
thus concludes that Defendants had no duty to disclose to Plaintiffs
their bankruptcy proceedings or the fact that the home they sold was in
foreclosure.  Accordingly, Plaintiffs' claim for fraud by non-disclosure
fails and Plaintiffs' objection is overruled.

3.     **Breach of Duty of Good Faith and Fair Dealing Claim
       (Objections Ten and Eleven)**

Finally, Plaintiffs object to the Bankruptcy Court's denial of their
claim that Defendants breached the implied duty of good faith and fair
dealing.  In New Mexico, "[w]hether express or not, every contract
imposes upon the parties a duty of good faith and fair dealing in its

---

[21] In their Objections, Plaintiffs cite to testimony at trial which shows that the home
had a cloud on its title that had to be corrected after the sale closed.  Obj. 30.
Plaintiffs cite this fact to prove that Defendants did not own the home when they
sold it to Plaintiffs.  *Id.*  However, it also shows that had Plaintiffs checked the title,
they would have discovered that the home "had a cloud on the title" that needed to
be cured.  *Id.*

performance and enforcement." *Watson Truck & Supply Co. v. Males*, 111 N.M. 57 (1990). In order to prevail on a claim for breach of duty of good faith and fair dealing, Plaintiffs must show that Defendants "wrongfully and intentionally used the contract to the detriment of the other party." *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 115 N.M. 690, 706 (1993).

In *Romero v. Mervyn's*, the Supreme Court of New Mexico found a breach of the duty of good faith and fair dealing in a case involving a store manager who promised to pay the medical bills of an injured customer. 109 N.M. 249, 258 (1989). The customer's bills were not paid and the evidence in the case showed that the manager made the promise in an effort to get the customer out of the store on one of the busiest shopping days of the year without any intention of ever keeping the promise. *Id.*

Plaintiffs assert that, similar to *Romero*, Defendants entered into the contract with the intent of breaching it. Specifically, Plaintiffs assert that Defendants intended to use "the proceeds of the sale to redeem the property from Citibank, and then [intended to] default[] on the monthly rental payments, thereby allowing Defendants to continue

to live in the Thoroughbred Property, rent free, while leaving Plaintiffs responsible for the monthly mortgage payments in Chapter 11." *Id.* 42. However, the record is devoid of evidence to support this theory. Defendants were undoubtedly misguided in believing that they would be able to afford rental payments higher than the mortgage payments on which they had defaulted, but there is no evidence that their intent from the outset was to breach. Indeed, they paid $12,568 in rental payments during the term of the lease. *Id.* 40. Had Defendants subjectively intended to live on the property "rent free" the whole time, they likely would not have paid Plaintiffs any rent. Thus, Plaintiffs have failed to meet their burden to establish that Defendants breached the duty of good faith and fair dealing and their objection is overruled.

## IV.   CONCLUSION

Having reviewed de novo the portions of the Proposed Findings and Conclusions to which Plaintiffs specifically object, the Court issues the following orders:

**IT IS ORDERED** that U.S. Bankruptcy Court for the Western District of Texas, El Paso Division's "Proposed Findings of Fact and Conclusions of Law with Respect to Trial in Adversary Proceeding No.

29

10-03019" (ECF. No 1) be **ADOPTED** except as otherwise set forth herein.

**IT IS FURTHER ORDERED** that Plaintiffs Joe Jesse Monge and Rosana Elena Monge are the rightful and legal owners of the real property and improvements described as:  Lot 17 in Block 3 of Los Ranchos Del Rio, located in Dona Ana, New Mexico, as the same is shown and designated on the plat thereof filed for record in the office of the County Clerk of Dona Ana, New Mexico on November 27, 1984 and recorded in Book 13 at Pages 344–345, Plat Records, with the property address of 105 Thoroughbred Court, Santa Teresa, New Mexico (herein "Thoroughbred Property").

**IT IS FURTHER ORDERED** that Plaintiffs Joe Jesse Monge and Rosana Elena Monge are entitled to immediate possession of the Thoroughbred Property, and Defendants Alicia Rojas and Francisco Javier Jayme shall immediately turn over possession of the Thoroughbred Property to Plaintiffs Joe Jesse Monge and Rosana Elena Monge.

**IT IS FURTHER ORDERED** that Plaintiffs Joe Jesse Monge and Rosana Elena Monge recover from Defendants Alicia Rojas and

Francisco Javier Jayme, jointly and severally, actual damages in the sum of $717,506 [plus $39,610, the amount of $7,992 a month from September 2014 through January 2015], with prejudgment interest of 8.430 percent per annum accruing on such sum from April 29, 2008, until the date of entry of this Final Judgment Order.  Prejudgment interest on this sum shall be computed as simple interest and shall not be compounded.

**IT IS FURTHER ORDERED** that Plaintiffs Joe Jesse Monge and Rosana Elena Monge also recover from Defendants Alicia Rojas and Francisco Javier Jayme, jointly and severally, the sum of $240,238 in attorneys' fees and expenses, and all costs of court.  No prejudgment interest on such sum is awarded.

**IT IS FURTHER ORDERED** that post-judgment interest is awarded to Plaintiffs Joe Jesse Monge and Rosana Elena Monge against Defendants Alicia Rojas and Francisco Javier Jayme on all sums recovered hereunder, at the rate of 0.18 percent per annum until paid in full, and shall be compounded annually pursuant to 29 U.S.C. § 1961(b).

**IT IS FURTHER ORDERED** that Plaintiffs Joe Jesse Monge and Rosana Elena Monge shall be entitled to such writs and processes from this Court as necessary to enforce and collect this Final Judgment.

**IT IS FURTHER ORDERED** that any and all other relief requested by Plaintiffs Joe Jesse Monge and Rosana Elena Monge against Defendants Alicia Rojas and Francisco Javier Jayme is **DENIED**.

**IT IS FURTHER ORDERED** that all relief requested by Defendants and Counter-Plaintiffs Alicia Rojas and Francisco Javier Jayme against Plaintiffs and Counter-Defendants Joe Jesse Monge and Rosana Elena Monge is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs Joe Jesse Monge and Rosana Elena Monge shall recover nothing on their claims against Defendants Monroj Investments, Inc. and Northeast Patriot Plaza, Inc.

**IT IS FURTHER ORDERED** that all relief not expressly granted herein is **DENIED**.

32

**IT IS FINALLY ORDERED** that all pending motions are

**DENIED AS MOOT**.

SIGNED this ____27____ day of **January, 2015**.

PHILIP R. MARTINÉZ
UNITED STATES DISTRICT JUDGE